# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CLASSIC CAB, INC.,** *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **DISTRICT OF COLUMBIA,** *et al.*, <br><br> Defendants. | Case No. 17-cv-2820 (CRC) |

## MEMORANDUM OPINION

The District of Columbia's Department of For-Hire Vehicles has been on a years-long campaign to modernize the District's taxicab industry. Facing competitive pressure from app-based ride-hailing services like Uber and Lyft, the Department beginning in late 2016 adopted a series of rules that require taxi operators to transition from traditional analog metering systems to newer systems called "digital taxicab solutions," or "DTS." Like those popular ride-hailing services, the DTS systems are designed to run on mobile devices and calculate fares using GPS technology.

Classic Cab, Inc., a taxicab operator in the District, along with its owner, brought this eleventh-hour suit on December 29, 2017, seeking to halt the DTS requirement from going into effect on the first day of the New Year. In their motion for a temporary restraining order, they contend that the Department's rulemaking violates several federal constitutional provisions as well as the District of Columbia Administrative Procedure Act, and that those violations have caused them serious economic harm. For the reasons that follow, the Court finds that the plaintiffs are not entitled to preliminary relief, and it will therefore deny their motion.

## I. Background

The Department of For-Hire Vehicles has regulatory authority over all taxicab operators in the District of Columbia. D.C. Code § 50-301.07. Among the Department's powers is the ability to "[e]stablish standards and requirements relating to the modernization of equipment and equipment design." Id. § 50-301.07(c)(5). It exercises this power through administrative rulemaking, subject to the requirements of the District of Columbia Administrative Procedure Act ("D.C. APA"), D.C. Code § 2-505. See id. § 50-301.07(d)(1) (providing that D.C. APA applies to Department rulemaking).

The D.C. APA generally requires agencies to issue notice and hold a public comment period before implementing a rule. See D.C. Code § 2-505(a)–(b). The Department's DTS rules, however, were issued pursuant to § 2-505(c), which allows for "emergency rulemaking" in certain circumstances. That section provides:

> [I]f, in an emergency, as determined by the Mayor or an independent agency, the adoption of a rule is necessary for the immediate preservation of the public peace, health, safety, welfare, or morals, the Mayor or such independent agency may adopt such rules as may be necessary in the circumstances, and such rule may become effective immediately. Any such emergency rule shall forthwith be published and filed in the manner prescribed in subchapter III of this chapter. No such rule shall remain in effect longer than 120 days after the date of its adoption.

Beginning in September 2016, the District issued a string of seven emergency rulemaking notices related to DTS. The first notice provided that, beginning on September 13, 2016, the District would no longer approve any non-DTS systems for use in taxicabs. Def.'s Opp. Ex. B, at 9. Taxicabs would be permitted to use either MTS or DTS systems for a year, but, beginning in September 2017, taxicabs would be required to use DTS systems or else face civil penalties. Id. While not published in the D.C. Register, this first notice was posted on the District's website along with instructions for filing written comments. Def.'s Opp. Ex. B, at 22. The

2

Department also published notice in the D.C. Register of a November 2016 hearing regarding that rulemaking. 63 D.C. Reg. 13694.

As provided by § 2-505(c), this first rulemaking expired on January 11, 2017, 120 days after its effective date. Following its expiration, the Department issued a second notice that was substantially similar to the first and also unpublished. Id. Ex. C. This process repeated four more times, with notices issued on May 11 (id. Ex. D), June 28 (id. Ex. E), and August 11, 2017 (id. Ex. G). Each of the rules stated that the DTS requirement would become effective on September 1, 2017. Then, on September 1, the Department issued a sixth emergency notice, this time publishing it in the D.C. Register. See 64 D.C. Reg. 8696. The notice, citing concerns about implementation, pushed back the effective date of the DTS requirement to October 31, 2017. See id. The Department held a public hearing in late September, see 64 D.C. Reg. 65396 (hearing notice), and provided a 45-day comment period, see 64 D.C. Reg. 11950.

To account for the comments submitted—particularly those related to accessibility of the new systems—the Department published a seventh notice on October 27 setting forth the DTS requirement that is currently in force. Id. This "Notice of Second Emergency and Proposed Rulemaking" slightly modified the prior notice and extended the effective date from October 31, 2017 to January 1, 2018. Id. Beginning on that date, no taxicab would be able to operate in the District of Columbia unless it used a DTS system. Id. The Department held a hearing regarding this second notice on December 12, 2017, 64 D.C. Reg. 66538 (Dec. 8, 2017), and purports to be crafting a final, non-emergency version of the rule that will be issued shortly, see Defs.' Opp. at 6–7.

The substantive content of the seven rulemaking notices was fairly similar. The new rule requires taxicab companies in the District to transition from traditional analog metering

systems—known as "modern taximeter systems" or "MTS"—to DTS systems approved by the Department. See 64 D.C. Reg. 11950, 11954–55 (current rule). There is not a single mandatory DTS system, nor is there a requirement that each taxicab company design its own system from the ground up. Rather, each taxicab in the District must use a system supplied by an approved DTS "provider." Any taxicab company in the District can apply to be approved by the Department as a "provider—meaning that they can supply their DTS system to other companies or use it in their vehicles. Id. at 11955–56. To be a provider, the taxicab company must verify that its system meets or exceeds the Department's technological requirements: namely, that it contains (1) a digital taximeter that calculates fares using GPS and integrates with DC TaxiApp, the consumer taxicab application that predates DTS; (2) a passenger console with a digital display; and (3) a credit card processing device. Id. at 11958–59. So long as it meets these requirements, the DTS system can rely on third-party software or may implement a digital taximeter application that the Department has itself designed and made available to providers. See id. at 11955. Companies can apply to be approved as providers during the Department's annual "open season" period, the first of which concluded in August 2017. Defs.' Opp. Ex. A, at 3 (Department Administrative Issuance from Feb. 14, 2017).

The notices also spelled out the Department's rationale for imposing the DTS requirement, and for using emergency rulemaking procedures to do so. Citing an uninterrupted decline in taxicab rides for the past year and a commensurate drop in revenues, the more recent, published notices explained that the Department sought to immediately "alleviate the rapidly-deteriorating competitive position of taxicabs in the District's vehicle-for-hire industry" caused by the rise of private-vehicle services like Uber and Lyft. 64 D.C. Reg. 8696; id. at 11950. The Department explained that the DTS requirement would aid taxis' competitive position by

4

mirroring the features of those app-based services and by allowing for future innovation through its open-ended design—results that could not be achieved with the MTS. 64 D.C. Reg. 8696, 8698.

Three days before the DTS requirement was set to take effect, the plaintiffs—Classic Cab and its owner, Mushtaq Gilani—filed this suit against the District, its Mayor, the Department, and the Department's director in his official capacity. In their complaint and motion for a temporary restraining order, they claim that the Department's emergency rulemaking violates the U.S. Constitution—specifically, the Due Process and the Takings Clauses of the Fifth Amendment, and the Contract and Commerce Clauses of Article I—and runs afoul of the D.C. APA.

The plaintiffs contend that preliminary injunctive relief is necessary because the rule, even before its implementation, has caused them grave economic loss and that, when the rule takes effect, it will likely force Classic Cab to shut down. Pl.'s Mot. ¶ 37. They explain that, before the DTS rule, a large portion of Classic Cab's revenue derived from MTS. Specifically, for several years prior to August 2017, Classic Cab held an exclusive license from the Department—subject to renewal each year—to provide and maintain MTS. To capitalize on this license, Classic Cab in 2013 executed a seven-year contract with a private third party, Creative Mobile Technologies, based in New York. Under that agreement, Creative would install MTS in Classic Cab's fleet of around 1,700 vehicles—consisting mostly of taxis owned by other taxicab operators. The contract granted Classic Cab 0.25% of all credit card transactions, $0.10 per credit card swipe, and a $5 monthly maintenance fee—in total, about $300,000 annually. The plaintiffs claim that the new DTS requirement destroys the value of this contract.

After reviewing the plaintiffs' motion, the Court instructed the parties to propose a schedule for expedited briefing and a hearing. In response to the Court's request, the District represented that "through January 31, 2018 [the Department] will not begin issuing fines or penalties for violations of the regulations at issue." Def.'s Proposed Br. Sched. at 1 (ECF No. 7). The Court accordingly set a briefing schedule that concluded on January 19 and held a hearing on January 24.

## II. Standard of Review

With the Court having declined to grant the plaintiffs' motion for a temporary restraining order *ex parte*—and instead having directed briefing and held a hearing—the Court will evaluate the plaintiffs' motion as one for a preliminary injunction. See Fed. R. Civ. P. 65. Plaintiffs seeking preliminary equitable relief bear the burden of showing (1) that they are likely to succeed on the merits of their claim; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. Winter v. Nat. Resources Defense Council, Inc., 555 U.S. 7, 20 (2008). The D.C. Circuit has suggested that the failure to establish a likelihood of success on the merits categorically forecloses preliminary relief. Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011). Similarly, an absence of irreparable injury is fatal to a plaintiff's motion. See Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).

## III. Analysis

### A. The Plaintiffs Are Unlikely to Succeed on the Merits of Any Claim

The plaintiffs challenge the DTS rules under several federal constitutional provisions pursuant to 42 U.S.C. § 1983, and under the D.C. APA. The Court finds that the plaintiffs are unlikely to succeed on the merits of any of their constitutional claims, and that the Court is

unlikely to exercise supplemental jurisdiction over, and therefore reach the merits of, their D.C. APA claim.

   *1. Due Process Clause*

The plaintiffs first contend that the District's rulemaking deprived them of their property without due process of law in violation of the Fifth Amendment.[1] Compl. ¶ 9; TRO Memo ¶¶ 44–46. To establish a due process violation, the plaintiffs would need to show that (1) they were deprived of a constitutionally protected interest in property (2) through a deficient process. See, e.g., Propert v. Dist. of Columbia, 948 F.2d 1327, 1331 (D.C. Cir. 1991). The Court doubts the plaintiffs' claim on both of these fronts.

   a. The deprivation of a property interest

The plaintiffs allege that the DTS rule deprives them of three related property interests. First is their "business," broadly speaking. See Pl.'s Mot. ¶ 89 (referring to plaintiffs' property rights "in its taxicab business, which consists of its vehicles, contracts, employees, drivers and office"). Of course, the plaintiffs do have a property interest in Classic Cab *itself*, as a business entity. But the DTS regulation does not outright strip the plaintiffs of their business—for example, by seizing Classic Cab, by revoking its taxi license, or by otherwise demanding that it shutter its doors. The regulation instead imposes a condition on the business's continued operation. To the extent that the plaintiffs attempt to characterize their continued operation as a property interest—one "deprived" by costly new technological requirements—the Due Process Clause does not help them. Businesses generally do not have property interests in their assets or

---

[1] "The procedural due process protections under the Fifth and Fourteenth Amendments are the same; however, only the Fifth Amendment applies to the District of Columbia." English v. District of Columbia, 717 F.3d 968, 971 (D.C. Cir. 2013).

revenues. Those are "incidents" to ownership—goals that are far from guaranteed, and certainly not guaranteed by the government. United States v. General Motors Corp., 323 U.S. 373, 378 (1945) ("[T]he Fifth Amendment concerns itself solely with the 'property,' i.e., with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership."); see also Bd. of Regents v. Roth, 408 U.S. 564, 576 (1972) ("To have a property interest in a benefit, a person . . . must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.").

Classic Cab also points to its license from the Department granting it an exclusive right to provide MTS to District taxicab operators. But the relevant sequence of events belies the notion that the DTS regulation deprived Classic Cab of this license: The plaintiffs at the January 24 hearing represented that the license expired in August 2017, yet the Department's rules did not bar the use of MTS until January 2018. And given the absence of any guarantee that Classic Cab would have its license renewed, it cannot plausibly be argued that the prospective rulemaking affected any *existing* property interest. See, e.g., Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis, 572 F.3d 502, 510 (8th Cir. 2009) (holding that taxi operators have no constitutionally protected interest in the market value of their taxi licenses—even where the owners alleged that the value was fully erased by a regulation that eliminated the cap on the number of available licenses); Dennis Melancon, Inc. v. City of New Orleans, 703 F.3d 262, 269 (5th Cir. 2012) (similar).

Finally, the plaintiffs cite their contract with Creative Mobile Technologies, which admittedly is more likely a property right protectable under the Due Process Clause. The DTS regulation, however, has not deprived the plaintiffs of any legal rights or remedies arising from the contract. At most, it has had the *effect* of reducing or eliminating the contract's value. If this

is a cognizable constitutional claim, it is more likely so under the Contract Clause, not the Due Process Clause. (Though, for the reasons explained below, the former claim will not likely succeed either.).

b. The process that was due

At bottom, it is doubtful that the plaintiffs have been deprived of any interest in property[2] that is subject to protection under the Due Process Clause. But even assuming that the plaintiffs have been deprived of a cognizable property interest in the value of its taxi business or in its contract with Creative, the process that the District afforded was constitutionally sufficient.

The plaintiffs' primary argument to the contrary is that, because the District used emergency rulemaking absent a bona fide emergency, and because the rule has been in effect for more than the 120 days permitted under the D.C. APA, the District's rulemaking procedures *necessarily* violated the Due Process Clause.[3] But this approach, which bootstraps the D.C. APA into a source of constitutional protections, does not find support in due process doctrine. Even assuming that the District's use of emergency rulemaking violated the letter of D.C. Code § 2-505(c), a person is not deprived of due process whenever a government entity fails to follow

---

[2] In their complaint and motion, the plaintiffs focus exclusively on "property" but, for the first time in their reply brief, they also throw "liberty" into the mix. The plaintiffs have thus waived any contention that the DTS regulation deprives the plaintiffs of a protected liberty interest. Even if that were not true, the Court strongly doubts that the plaintiffs could identify any recognized liberty interest deprived by the DTS regulation.

[3] There is no allegation that the District's regulation is so *substantively* arbitrary that it constitutes a violation of "substantive due process." See Zinermon v. Burch, 494 U.S. 113, 125 (1990) ("[T]he Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'" (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986))). And for good reason: the plaintiffs could succeed on a substantive due process challenge only if they showed that no conceivable rational basis supporting enactment of the DTS regulation. See Am. Fed'n of Gov't Employees, AFL–CIO v. United States, 330 F.3d 513, 523 (D.C. Cir. 2003).

procedures established by statute or regulation. See, e.g., Sloan v. Dep't of Hous. & Urban Dev., 231 F.3d 10, 18 (D.C. Cir. 2000) (finding agency decision was arbitrary and capricious under the federal Administrative Procedure Act but that agency did not violate due process). A contrary reading of the Due Process Clause—one that constitutionalized all state-imposed procedural requirements—would thrust federal district courts into the role of reviewing all state administrative decisionmaking, dramatically expanding the scope of federal jurisdiction and violating basic principles of comity.

Rather, the question of what process is due is a pure question of federal constitutional law. And with broadly applicable "'legislative-type' rulemaking," like that which produced the challenged rule here, "notice and written comment procedures comport with due process." Pickus v. U.S. Bd. of Parole, 543 F.2d 240, 244 (D.C. Cir. 1976). The District's two latest emergency rulemakings were preceded by a notice published in the D.C. Register, a 45-day period for the submission of written comments, and a public hearing—a set of procedures that has been consistently upheld as constitutional.[4]

Finally, the plaintiffs could be understood to raise an alternative theory under the Due Process Clause: that, in the earlier rounds of emergency rulemaking, they did not receive adequate notice of the rulemaking or an ability to meaningfully participate in it. To be sure, those prior rulemakings could theoretically raise due process problems if they deprived the plaintiffs of a property interest. But there is no plausible allegation that the now-expired notices

---

[4] Indeed, sticking with the Constitution and leaving aside any statutory requirements, a hearing prior to adoption of the DTS requirement was likely unnecessary. See Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441, 445 (1915) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.").

of emergency rulemaking are *presently* injuring the plaintiffs, or that they pose them a substantial risk of future harm. Thus, as a matter of Article III standing, even grave procedural defects in those prior rulemakings would not support prospective relief like an injunction or declaration. See <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 493 (2009) (explaining that a plaintiff "bears the burden of showing that he has standing for each type of relief sought"); <u>O'Shea v. Littleton</u>, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Rather, at the time the plaintiffs filed suit, the only regulation under which they faced the threat of enforcement was the one set forth in the most recent notice of emergency rulemaking. And, as the Court has explained, that regulation was the product of procedures—notice, comment, and a hearing—that almost certainly complied with due process.

2. *Takings Clause*

The plaintiffs next contend that the District's imposition of a DTS requirement effected an unlawful taking of their property in violation of the Fifth Amendment's Takings Clause, which prohibits the taking of "private property for public use, without just compensation." For government action to require compensation under the Takings Clause, it must involve "property" and that property must be "taken." And as with the plaintiffs' due process challenge, their takings claim is dubious on both of these fronts.

First, the scope of "property" protected by the Takings Clauses is no broader than that protected by the Due Process Clause. See <u>Lucas v. S.C. Coastal Council</u>, 505 U.S. 1003, 1030 (1992) (in takings claim, quoting <u>Roth</u>, 408 U.S. at 576, for the proposition that 'existing rules or understandings that stem from an independent source such as state law' . . . define the range of

11

interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments"). Thus, as the Court has explained in questioning the merits of the plaintiffs' due process arguments, they cannot claim a protected property interest in their profits, or in their since-lapsed license to provide MTS technology.

Rather, the only plausible source of a property right here is Classic Cab's MTS contract with Creative. See Lynch v. United States, 292 U. S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a State or the United States."). But the DTS regulation here does not effect a taking of that contract. In arguing to the contrary, the plaintiffs invoke the three-factor standard used to evaluate whether a government regulation effects a taking: (1) the economic impact of the regulation, (2) the extent to which it interferes with the business's reasonable investment-backed expectations, and (3) the nature of the government action. See Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978). Assuming that standard applies to regulations that diminish the value of private contracts,[5] the second and third Penn Central factors work strongly against the plaintiffs here. The fact that taxicab companies operate in a dense and rapidly changing regulatory environment undermines the reasonableness of betting on stasis.

Similarly, the nature of the government action here strongly suggests an absence of a taking. The DTS requirement "does not physically invade or permanently appropriate any of the [business's] assets for its own use," but rather interferes with the plaintiffs' contract rights in a

---

[5] The Supreme Court almost a century ago held, in categorical terms, that regulation making a private contract impossible to perform does not "take" the contract. Omnia Commercial Co. v. United States, 261 U.S. 502, 511–13 (1923) (distinguishing permissible regulations that result in "[f]rustration" from impermissible ones that effect "appropriation"). Subsequent decisions like Penn Central, while more flexible in their approach to regulatory takings, did not purport to overrule Omnia.

12

way "that adjusts the benefits and burdens of economic life to promote the common good." Connolly v. Pension Ben. Guar. Corp., 427 U.S. 211, 225 (1986) (upholding statute requiring employers to permanently transfer assets to pension funds as necessary to satisfy new statutory obligations). As such, it is not a "taking" of any property right associated with Classic Cab's contract. So whether for lack of protected "property" or for lack of a "taking," the plaintiffs are unlikely to establish on the merits that the DTS requirement violates the Takings Clause.

    3. *Contract Clause*

The plaintiffs next claim that the DTS regulation impairs their private contract with Creative in violation of the Contract Clause of Article I, which forbids the District of Columbia from passing any law "impairing the Obligation of Contracts." U.S. Const., art. I, § 10; see also Wash. Teachers' Union Local No. 6, Am. Fed'n of Teachers, AFL-CIO, v. Bd. of Ed., 109 F.3d 774, 778 (1997) (explaining that, while Congress is not subject to the Contract Clause when legislating for the District, the District's own legislation and regulation is subject to the Contract Clause pursuant to D.C. Code § 1-204).

There is no Contract Clause violation here. The Court will assume that the plaintiffs have established all three of the Clause's necessary predicates: (1) that a contractual relationship existed (the plaintiffs' 2013 agreement with Creative); (2) that a change in regulation impaired that relationship (the DTS requirement diminishes the value of that that contract); and (3) that the impairment was substantial (the contract may be valueless if Classic Cab cannot use MTS). See General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992).[6] The plaintiffs have nevertheless

---

[6] The Court does, however, have doubts as to whether the plaintiffs could succeed in showing a substantial impairment of their contractual relationship. While Classic Cab and Creative signed a seven-year agreement, Classic Cab's right to provide District taxicab operators

13

failed to satisfy the second requirement: showing that the impairment was not "reasonable and necessary to serve an important public purpose." U.S. Trust Co. v. New Jersey, 431 U.S. 1, 25 (1977). When a regulation affects a private contract, as opposed to a public one, the government entity is given wide latitude in deeming any interference reasonable and necessary, and in defining public purposes as important. Id. at 22 ("The States must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from the state regulation by making private contractual arrangements.").

Moreover, the regulation here "deal[s] with a broad, generalized economic or social problem"—the modernization of common carriers—and, as already explained, it "operate[s] in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken"—the heavily regulated taxicab industry. Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 250 (1978). Regulations with either of those attributes, let alone both, regularly survive Contract Clause challenge. Cf. Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398 (1934); Veix v. Sixth Ward Building & Loan Assn., 310 U.S. 32 (1940). Thus, the District's aims in passing the DTS regulation likely justify even a significant impairment of the plaintiffs' contract with Creative. The plaintiffs are thus unlikely to succeed on their claim under the Contract Clause.

    *4. Commerce Clause*

The plaintiffs also contend that the DTS regulation violates the "dormant" aspect of the Commerce Clause by discriminating against commerce outside the District. But there is simply

---

with MTS was subject to the Department's renewal each year. Moreover, the two entities' relationship not impeded by new regulation until 2016—the fourth year of its seven-year term.

no indication in the present record that the DTS regulation has either of the attributes that create problems under the dormant Commerce Clause: that it (1) facially discriminates against out-of-District entities or (2) burdens them to a degree that is "clearly excessive in relation to the putative local benefits." Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338 (2008) (quoting Pike v. Bruce Church, 397 U.S. 137, 142 (1970)).  The regulation simply requires taxicab operators within the District to use a certain technology system.  And while only District taxicab companies can qualify as DTS providers, a provider is free to contract with any other business—inside or outside the District—to create and operate the DTS system.  See 64 D.C. Reg. 11950, 11954–61; see also Def.'s Opp. Ex. H, at 4 (Department administrative issuance explaining that rule allows companies to "fulfill its legal obligations to operate a DTS by contracting with another business").  As such, the rule can hardly be said to hinder the "flow of interstate commerce."  Maine v. Taylor, 477 U.S. 131, 151 (1986).  Nor does the District's own participation in the DTS regime—through its creation and provision of a DTS app—create any concerns under the Clause.  Cf. Davis, 553 U.S. at 339 (explaining exception to dormant Commerce Clause covering "States that go beyond regulation and themselves participate in the market so as to exercise the right to favor their own citizens over others" (internal quotation omitted)).  In short, there is no discrimination in purpose or effect against out-of-District commerce, and thus no violation of the dormant Commerce Clause.

5. *D.C. Administrative Procedure Act*

Finally, beyond drawing on the D.C. APA as a source of federal constitutional protections, the plaintiffs bring a District-law claim directly under the Act.  They contend that the Department was forbidden from using emergency rulemaking procedures set forth in D.C. Code § 2-505(c) to promulgate any of the DTS rulemaking notices, including the one now in

15

effect, and that the "chain" of emergency rulemakings effectively circumvented § 2-505(c)'s 120-day limit on emergency rulemaking.

Without weighing in on the plaintiffs' substantive arguments under the D.C. APA, the Court finds that they are unlikely to succeed on the merits of this claim—at least before *this* Court. Because their claim is rooted in District law and not federal law, the Court could award relief only if it exercised supplemental jurisdiction over the claim. See 28 U.S.C. § 1367; id. § 1366 (clarifying that claims arising under District of Columbia law do not fall within federal original jurisdiction). But with the Court having found the plaintiffs unlikely to succeed on the merits of all of their federal claims, it follows that eventual dismissal of those claims is likely. And, in turn, the Court will likely decline to exercise supplemental jurisdiction over the plaintiffs' District-law claim. 28 U.S.C. § 1367(c)(3) (allowing district court to decline supplemental jurisdiction if the Court "has dismissed all claims over which it has original jurisdiction"); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); Lightfoot v. District of Columbia, 448 F.3d 392, 399 (D.C. Cir. 2006) (in remanding case, explaining that if "there are no longer any viable federal claims in this suit . . . the district court should dismiss the DCAPA claim").

The Court is especially unlikely to ultimately exercise supplemental jurisdiction in this case, as the plaintiffs' claim appears to raise colorable and yet-unresolved questions about the propriety of emergency rulemaking in contexts like this one. See 28 U.S.C. § 1367(c)(1); see also Lightfoot, 448 F.3d at 399 (suggesting that it may be "unwise to exercise supplemental jurisdiction over [a] District claim" under the D.C. APA because that statute "places exclusive jurisdiction in the D.C. Court of Appeals to review District agency action").

16

To be clear: Because the plaintiffs' D.C. APA claim arises on a motion for a preliminary injunction, the Court's refusal of supplemental jurisdiction over the claim does not demand that the claim be dismissed. Based on the Court's future disposition of the plaintiffs' federal constitutional claims, it might then reevaluate whether supplemental jurisdiction over the District-law claim is warranted. But, given that the Court finds the plaintiffs unlikely to succeed on those federal claims, they may also wish to voluntarily dismiss their D.C. APA claim in this action and bring it in the District of Columbia's local courts—most likely, the D.C. Court of Appeals, which under D.C. law has exclusive jurisdiction over challenges to the District's administrative actions. See Fair Care Found., A.G. v. D.C. Dep't of Ins. & Secs. Reg., 716 A.2d 987, 997 (D.C. 1998). Candidly, that forum would be better suited to the plaintiffs' claim. Robinson, 841 F.2d at 1157 (endorsing district court's refusal of supplemental jurisdiction over claim under the D.C. APA and its suggestion that D.C. local courts were preferable forum for that claim).

### B. The Plaintiffs Have Not Established Irreparable Harm Stemming from the Challenged Regulations

The D.C. Circuit has suggested—but has not conclusively held—that a plaintiff's failure to establish a likelihood of success on the merits demands that a court deny preliminary relief. See, e.g., Sherley, 644 F.3d at 388 ("[W]e read Winter at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction." (internal quotation omitted)); see also Munaf v. Green, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits." (internal quotation omitted)).

Even under the alternative "sliding-scale" approach of evaluating the four preliminary injunction factors—where "a strong showing on one factor could make up for a weaker showing

17

on another," Sherley, 644 F.3d at 388—the Court finds the plaintiffs' claims so unlikely to succeed on the merits that even a strong likelihood of serious and irreparable injury would not justify an injunction. Nor have they made such a showing. Economic loss alone is not "irreparable" because it can be remedied by damages. Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985). So Classic Cab's claimed loss of profits cannot sustain a preliminary injunction. And while loss so severe that it threatens the "very existence of the movant's business" may constitute irreparable injury, a plaintiff must explain concretely why the specific action he challenges is highly likely (if not certain) to immediately cause that loss. See League of Women Voters of U.S. v. Newby, 838 F.3d 1, 7 (D.C. Cir. 2016). The plaintiffs here have simply failed to make that showing. To be sure, Classic Cab has lost many of the vehicles to which it previously supplied MTS technology. But the plaintiffs have not adequately explained why they cannot continue operating under the new regime by applying to be a DTS provider during the next application cycle.[7] And, in the interim, Classic Cab may continue to operate its own branded cabs by simply installing approved DTS systems from another provider. There is therefore an insufficient showing that Classic Cab's "very existence" is immediately threatened.

## IV. Conclusion

At bottom, the plaintiffs' failure to demonstrate a likelihood of success on the merits of any claims, combined with their tenuous showing of an irreparable injury, demands that the Court deny their request for preliminary relief. The Court will therefore deny Plaintiffs' motion

---

[7] For reasons that are not entirely clear, Classic Cab did not apply to be approved as a DTS provider during the Department's initial "open season" period, which was between February and August 2017. See Defs.' Opp. Ex. A, at 3. In any event, the plaintiffs conceded at the Court's hearing that Classic Cab is eligible for approval during the next application period.

for a temporary restraining order and declaratory judgment (ECF No. 2). A separate Order accompanies this Memorandum Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: January 24, 2018